# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JORGE RAUL TENEMASA-LEMA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. |
| v. | ) | 25-13029-BEM |
| | ) | |
| PATRICIA HYDE, et al., | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM AND ORDER ON
## PETITION FOR WRIT OF HABEAS CORPUS

**MURPHY, J.**

On September 4, 2021, U.S. Customs and Border Protection ("CBP") paroled Petitioner into the United States. For the next four years, Petitioner lived here, in regular contact with U.S. Immigration and Customs Enforcement ("ICE"), largely without incident. Yet, on October 9, 2025, ICE arrested Petitioner. Petitioner has since been detained, and denied a bond hearing, based on the mandatory detention statute applicable to arriving aliens.

"[T]he indefinite detention without access to bond or bail of *any* person in the United States violates due process." *Castaneda v. Souza*, 810 F.3d 15, 44 (1st Cir. 2015) (Torruella, J., concurring) (emphasis in original) (citing *Wong Wing v. United States*, 163 U.S. 228, 238 (1896), and *Yick Wo v. Hopkins*, 118 U.S. 356, 369–70 (1886)). Petitioner's incarceration falls squarely within that rule. Accordingly, the Court will grant this Petition in part and order that Petitioner receive a constitutionally adequate bond hearing.

## I.    **Background**

Petitioner is a native and citizen of Ecuador.[1]  Dkt. 9-1 ¶ 5.  On September 4, 2021, Petitioner entered the United States without inspection at or near the Eagle Pass International Bridge in Texas.  *Id.* ¶ 6.  Shortly thereafter, roughly one mile away, Petitioner was detained by CBP.  *Id.* ¶ 7.

The next day, on September 5, 2021, CBP paroled Petitioner into the United States pursuant to 8 U.S.C. § 1182(d)(5)(A) ("section 1182(d)(5)(A)").  *Id.* ¶ 8.  By its terms, that grant of parole expired about two weeks later, on September 21, 2021.  *Id.*; *see also id.* at 5.

Two *months* later, on November 16, 2021, ICE served Petitioner with a Notice to Appear in immigration court, charging him as inadmissible.  *Id.* ¶ 9.  ICE also served Petitioner a Warrant for Arrest of Alien (Form I-200), "pursuant to sections 236 and 287 of the Immigration and Nationality Act," codified at 8 U.S.C. §§ 1226, 1357.  *Id.* ¶ 10; *see also* Dkt. 1-4; Dkt. 1-5.  Despite serving Petitioner a Warrant for Arrest, however, ICE did not then detain him.  Dkt. 9-1 ¶ 10.

Four *years* later, on October 9, 2025, Petitioner appeared for a scheduled check-in at an ICE office in Burlington, Massachusetts.  *Id.* ¶ 13.  Without further explanation, ICE detained him. *Id.*  Respondents have since held Petitioner in a prison in Plymouth, Massachusetts.  *Id.* ¶ 15.  Prior to detention, Petitioner had lived with his wife and daughter.  Dkt. 1 ¶ 4.

On October 16, 2025, Petitioner sought a writ of habeas corpus in this Court.  Dkt. 1.  On October 24, 2025, Respondents opposed.  Dkt. 9.  On November 14, 2025, the Court held a hearing and took the matter under advisement.  Dkt. 16.

---

[1] Unless otherwise noted, the relevant facts are not in dispute and are drawn variously from the Petition and its exhibits, *see generally* Dkt. 1, and from a declaration and exhibit submitted by Respondents' agent, *see* Dkt. 9-1.

II.  **Discussion**

A.  **Statutory Issues**

1.  **Section 1225 or 1226 ("Arriving" or "Present")**

As a threshold matter, the Court must determine which of the two pre-removal immigration detention statutes—8 U.S.C. §§ 1225 or 1226 ("sections 1225 or 1226")—governs this detention. That assessment turns on whether Petitioner was an "arriving alien" at the time of his detention or instead already "present in the United States." *See Aguiriano Romero v. Hyde*, — F. Supp. —, 2025 WL 2403827, at *8, 11 (D. Mass. Aug. 19, 2025) ("[S]ection 1225 governs detention of non-citizens 'seeking admission into the country,' whereas section 1226 governs detention of non-citizens 'already in the country.'" (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 288–89 (2018)). For reasons stated in Section II(A)(2), the Court finds that the relevant point in time is when CBP first encountered and detained Petitioner on September 4, 2021. *Cf. Diaz Martinez v. Hyde*, 792 F. Supp. 3d 211, 222–23 (D. Mass. 2025) (finding that the relevant point in time was when ICE detained a petitioner "more than a year after her initial encounter" with CBP).

The Court considers this a close call. Petitioner was detained roughly one mile inland from the Eagle Pass International Bridge, on the border between the United States and Mexico.[2] *See* Dkt. 1 ¶ 1; Dkt. 9-1 at 5. This is substantially more than the 25 yards at issue in *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139–40 (2020) (concluding that a petitioner had not effected an entry into the United States for purposes of the Due Process Clause).[3] In many cases, a mile's distance may clearly and sufficiently indicate that an entrance has occurred. *See, e.g.*, *United States v. Guzman-Hernandez*, 487 F. Supp. 3d 985, 990–91 (E.D. Wash. 2020) (concluding that an individual detained "three-quarters of a mile from the border" had effected an entry).

In this case, however, the Court finds that it lacks sufficient information to draw that conclusion. *See Espinoza v. Sabol*, 558 F.3d 83, 89 (1st Cir. 2009) ("The burden of proof of showing deprivation of rights leading to unlawful detention is on the petitioner."). In the legal sense, entry "requires more than just 'physical presence' in U.S. territory." *See United States v.*

---

[2] Petitioner states that he was apprehended "one mile inland into Eagle Pass, Texas." Dkt. 1 ¶ 1. CBP records submitted by Respondents state that Petitioner was detained "1 mile(s) W of EGP," which the Court takes to mean one mile west of Eagle Pass. Dkt. 9-1 at 5. The Court further accepts as undisputed Respondents' clarification that the relevant "Eagle Pass" reference point is the "Eagle Pass International Bridge," rather than the city of Eagle Pass, Texas, generally. *See id.* ¶ 6; Dkt. 10 at 2–3.

At the hearing, Respondents questioned whether the CBP record, stating that Petitioner was detained "1 mile[] *W[est]*," Dkt. 9-1 at 5 (emphasis added), corroborates Petitioner's claim that he was detained "one mile ***inland***," *see* Dkt. 1 ¶ 1 (emphasis added). However, since then, the Court has noted that Eagle Pass is on a westerly border with Mexico, such that one mile *west* of Eagle Pass would necessarily be *in* Mexico. *See Jones v. Jasper Wyman & Son*, 2022 WL 2802889, at *13 (D. Me. July 18, 2022) ("Courts commonly use internet mapping tools to take judicial notice of distance and geography." (quoting *Rindfleisch v. Gentiva Health Sys., Inc.*, 752 F. Supp. 2d 246, 259 n.13 (E.D.N.Y. 2010) (collecting cases))). Obviously, that cannot be right. The Court thus takes the CBP record as mistaken and credits Petitioner's assertion that he was detained one mile "inland." This finding is consistent with the relevant times indicated on the CBP record, which states that Petitioner was apprehended fifteen minutes after entry, *see* Dkt. 9-1 at 5 (stating that the "Time . . . of Last/Attempted Entry" was "2050" and that the "Hour [of Apprehension]" was "2105"), insofar as 4 miles per hour is a believably brisk walking speed. For the reasons stated in this section, however, accepting Petitioner's assertion does not ultimately prove dispositive on this issue.

[3] The Court's analysis in this section concerns entry for purposes of the immigration detention statutes rather than the Due Process Clause. In the absence of any contrary argument, the Court assumes that those analyses are identical. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law."). The Court notes, however, that, theoretically, they might diverge.

*Liberato*, 142 F.4th 1174, 1179 (9th Cir. 2025) (quoting *United States v. Pacheco-Medina*, 212 F.3d 1162, 1163 (9th Cir. 2000), and citing *Matter of Pierre et al.*, 14 I. & N. Dec. 467, 469 (B.I.A. 1973)). Rather, "[a]n 'entry' involves (1) a crossing into the territorial limits of the United States, *i.e.* physical presence; plus (2) inspection and admission by an immigration officer; or (3) actual and intentional evasion of inspection at the nearest inspection point; coupled with (4) freedom from restraint." *Matter of Pierre et al.*, 14 I. & N. Dec. at 468 (internal citations omitted).[4] Here, other than an approximate distance between the border and his place of apprehension ("one mile inland into Eagle Pass, Texas," Dkt. 1 ¶ 1), Petitioner has not specifically asserted or otherwise offered any evidence to show that he "actual[ly] . . . eva[ded] . . . inspection" or was "free[] from restraint" after achieving "physical presence" in the United States. *See Matter of Pierre et al.*, 14 I. & N. Dec. at 468. Having considered aerial maps of the relevant area, the Court notes that a substantial portion of the one-mile radius extending from the Eagle Pass International Bridge consists of the inspection point itself.[5] Thus, considering the facts available, it is unclear whether Petitioner, for example, even passed the nearest immigration checkpoint.[6]

---

[4] Although the *Thuraissigiam* Court did not flesh out its entry analysis, its conclusion is nonetheless consistent with this long-standing definition. Having only made it 25 yards past the border, one can reasonably argue that the *Thuraissigiam* petitioner was never "free[] from restraint," such to constitute an entry. *See Matter of Pierre et al.*, 14 I. & N. Dec. at 468; *Thuraissigiam*, 591 U.S. at 139–40; *see also* Diana G. Li, *Due Process in Removal Proceedings After Thuraissigiam*, 74 STAN. L. REV. 793, 817–18 (2022) (making this point).

[5] *See Jones*, 2022 WL 2802889, at *13 (noting courts' common use of internet mapping tools).

[6] The Court further notes that CBP's paroling Petitioner into the United States under section 1182(d)(5)(A) is at least consistent with a contemporaneous, subjective understanding of Petitioner as having not yet effected an entry at the time of his apprehension. *See* Dkt. 9-1 ¶ 8; *cf. Diaz Martinez*, 792 F. Supp. 3d at 215 (reaching the opposite conclusion where the petitioner was released under different authority); *Portillo Martinez v. Hyde*, — F. Supp. 3d —, 2025 WL 3152847 at *8 & n.32 (D. Mass. Nov. 12, 2025) (similar). This is not to say that parole into the United States can have no application where an individual is already present in the United States. *See Doe v. Noem*, 152 F.4th 272, 277 (1st Cir. 2025) (noting that parole can confer benefits "[b]esides allowing legal access to the United States."). If Petitioner *had* already effected an entry, prior to his apprehension, CBP's grant of parole might just be a legal nullity, or at least irrelevant for present purposes. However, in this instance, the Court has found that it lacks sufficient information to reach that conclusion.

Accordingly, the Court accepts Respondents' contention that Petitioner's detention, pursuant to his September 4, 2021 apprehension, is governed by section 1225, rather than by section 1226.[7]

### 2.    **Effect of Parole**

Petitioner's history of parole under section 1182(d)(5)(A) does not necessarily change that result. Petitioner was paroled into the United States on September 5, 2021, which parole expired on September 21, 2021. Dkt. 9-1 ¶ 8. At the expiration of his parole, Petitioner was required to "forthwith return"—or else the Department of Homeland Security ("DHS") was required to return Petitioner—"to the custody from which he was paroled." 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. §§ 212.5(e)(1)(ii), 212.5(e)(2)(i) (providing that, when parole expires, a non-citizen "shall be restored to the status that he or she had at the time of parole"); *see also Velasquez Rincon v. Hyde*, — F. Supp. 3d —, 2025 WL 3122784, at *4 (D. Mass. Nov. 7, 2025) (further explaining this mechanism). DHS apparently failed, or declined, however, to detain Petitioner when his parole expired, *see* Dkt. 9-1 ¶ 8; and then again when it served him with a Notice to Appear in immigration court in November 2021, *id.* ¶¶ 9–10;[8] and then, repeatedly, "for years," as Respondents concede, "despite interacting with [him] . . . at his check-ins and during his removal proceedings," Dkt. 9 at 14.

One might expect that, at some point in those four years of inaction, DHS waived its right to "return" Petitioner to detention under section 1225. However, as a matter of statutory interpretation and federal common law, courts generally must assume that "an official's crucial

---

[7] Specifically, Respondents assert that Petitioner is detained under section 1225(b)(2), which applies to certain non-citizens who are placed, in the first instance, in full removal proceedings under 8 U.S.C. § 1229a, rather than expedited removal under section 1225(b)(1). *See generally* 8 U.S.C. §§ 1225(b)(1)–(2).

[8] Even if Petitioner's parole had not expired, it would have automatically terminated upon issuance of a Notice to Appear. *See* 8 C.F.R. § 212.5(e)(2(i).

duties are better carried out late than never." *See Nielsen v. Preap*, 586 U.S. 392, 411 (2019). Indeed, the Supreme Court has repeatedly held that, "if a statute does not specify a consequence for noncompliance with statutory timing provisions"—which, here, would have to be read into the statute as a matter of equity or reasonableness—"the federal courts will not in the ordinary course impose their own coercive sanction." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 159 (2003) (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993)). Admittedly, the Court here would not necessarily view this as a matter of "coercive sanction" against the Government, *cf. id.*, rather than as a recognition of rights and expectations Petitioner might have accrued as a result of DHS's repeated and seemingly deliberate inaction.[9] Nevertheless, the Supreme Court has instructed that the proper way to consider such interests is as a constitutional claim, *see Preap*, 586 U.S. at 420 ("While respondents might have raised a head-on constitutional challenge . . . , they did not."), to which guidance the Court adheres in the following section.

In sum, because DHS's statutory power to "return" Petitioner to custody under section 1225 at the expiration of his parole, *see* 8 U.S.C. § 1182(d)(5)(A), was not lost through DHS's inaction, that remains a proper authority for his current detention.

### B.    Constitutional Issues

#### 1.    Due Process

In the intervening years, however, Petitioner "developed strong ties to the country" that highlight the serious concern his detention without bond raises under the Fifth Amendment's Due

---

[9] In this respect, DHS's failure to detain following the expiration of parole is unlike its failure to detain criminally convicted non-citizens under section 1226(c) as considered by the Supreme Court in *Preap*. *See* 586 U.S. at 413 (noting that DHS's failure to detain as required under section 1226(c) is often the product of its not knowing when an individual subject to detention has been released from criminal custody). Here, all relevant information is in DHS's possession, and, especially where an individual is the subject of ongoing monitoring and removal proceedings, it is difficult to suggest that DHS is not actively cognizant of that person's status.

Process Clause. *See Preap*, 586 U.S. at 419–20.[10]  Respondents argue that Petitioner has no rights under the Due Process Clause regarding his detention because, by way of the statutory mechanism outlined above, Congress has said that Petitioner is to be treated as if he were still "on the threshold of initial entry," as if he were not literally here in the United States.  Dkt. 9 at 16–19 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)).

Recently, in a similar case, this Court rejected this argument, highlighting that constitutional due-process protections regarding detention flow simply as a matter of "geographic" presence within the United States, *see Velasquez Rincon*, 2025 WL 3122784, at *5–7 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)), notwithstanding any legal fiction that might affect a non-citizen's "rights regarding *admission*," *see id.* (emphasis added) (quoting *Thuraissigiam*, 591 U.S. at 140).

The Court stands by its reasoning, as articulated in *Velasquez Rincon*, which applies with equal force here.  Petitioner's case moreover presents an opportunity to show how the same result might obtain from a slightly different logic.  Much like the *Velasquez Rincon* petitioner, Petitioner has lived "with relative freedom in the United States for [more than] four years, finding his way across the country from Texas to Massachusetts."  *Id.* at *6.  Indeed, Petitioner has since made a home here with his wife and their daughter.  Dkt. 1 ¶ 4.  In *Thuraissigiam*, the Supreme Court affirmed the long-held principle that "aliens who have established connections in this country have

---

[10] *See also Jennings*, 583 U.S. at 312 (declining to address the constitutionality of mandatory detention under section 1225(b) and remanding the issue for further consideration); *id.* at 332–37 (Breyer, J., dissenting) (expressing "grave doubts" about the constitutionality of mandatory detention under section 1225(b) after considering the history of the Due Process Clause and its common-law antecedents (quoting *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916))).

due process rights."[11]  591 U.S. at 107.  Indeed, the Supreme Court has previously recognized that a non-citizen's "ties" to this country can inform the substance of their constitutional protections, even in the absence of strict physical presence.  *See Plasencia*, 459 U.S. at 32–34 (holding that a permanent resident was "entitled to due process in assessing his right to admission" upon returning from a short trip).[12]  Thus, even *without* disturbing the metaphysical "entry fiction" that may obstruct, in some senses, our ability to admit that a non-citizen is really "here," one can still constitutionally recognize Petitioner's actual life in this country—his years as part of our community—not so easily set aside.

Whatever theoretical route one takes, the only conclusion that makes sense to this Court is that Petitioner is a "person" who cannot "be deprived of life, liberty, or property, without due process of law."  U.S. CONST. amend. V.

### 2.    Application

Having established that Petitioner is due some quantum of process before being "deprived of . . . [his] liberty," *id.*, the three-part balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976), provides the framework for assessing what exactly is required to protect that interest. *See Hernandez-Lara v. Lyons*, 10 F.4th 19, 27–28 (1st Cir. 2021).

---

[11] The Supreme Court here was referring to "due process rights in deportation proceedings."  *Thuraissigiam*, 591 U.S. at 107.  The same reasoning should apply, *a fortiori*, to rights regarding detention, insofar as the former have far greater implications for Congress's plenary immigration powers.

[12] Although Petitioner is not as established in this country as was the *Plasencia* petitioner, the detention rights he puts at issue are also much less fraught.  *See Plasencia*, 459 U.S. at 32 ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights ***regarding his application***, for the power to admit or exclude aliens is a sovereign prerogative." (emphasis added)); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country.").

### a.    **Why *Mathews*?**

A brief detour here is appropriate to explain why analysis under *Mathews* is appropriate. Most decisively, this is the framework that the First Circuit applied in *Hernandez-Lara* to assess what process was due an individual detained under section 1226(a).  *See id.*  Under that authority, applicable to non-citizens apprehended from within the United States, *see Jennings*, 583 U.S. at 288–89, the Attorney General has discretion to order the release of an individual "on 'bond . . . or conditional parole.'"  *Hernandez-Lara*, 10 F.4th at 26 (ellipsis in original) (quoting 8 U.S.C. § 1226(a)).  By regulation, those decisions were delegated to immigration courts, which required detained non-citizens to "demonstrate 'to the satisfaction of the Immigration Judge that he or she merit[ed] release on bond.'"  *Id.* at 27 (quoting *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)).  "In contrast, the government "[did not] need . . . [to] show anything to justify incarceration."  *Id.* (quoting *Velasco Lopez v. Decker*, 978 F.3d 842, 849 (2d Cir. 2020)).

The First Circuit held that scheme unconstitutional.  *Id.* at 27–30 (considering the *Mathews* factors).  Although Congress had granted the Attorney General "discretion in each case to grant or deny bond," that discretion was ultimately "cabin[ed]" by "the constitutional restraints applicable to all government action."  *Id.* at 34.  Accordingly, the court affirmed the district court's conclusion that the Government was required to conduct a new bond hearing wherein it bore the burden of demonstrating that the petitioner's detention was necessary.[13]  *Id.* at 23–24.

---

[13] Although *Hernandez-Lara* might reasonably be summed as about the burdens of proof applicable in immigration bond hearings, it is worth remembering that the issue was framed as such only because of the groundwork laid by the Attorney General in establishing by regulation the immigration courts and their jurisdiction over bond decisions.  *See Hernandez-Lara*, 10 F.4th at 26–27.  Had the Attorney General established some *other* process (or, as in this case, virtually no process), the court's question would have been whether *that* process (or lack thereof) was sufficient, with a separate question of remedy to follow.  *See Application of Gault*, 387 U.S. 1, 71–72 (1967) (Harlan, J., concurring in part) (describing courts' task in remedying procedural due process violations as requiring "no more restrictions . . . than are imperative" and stating that such restrictions "should be those which preserve, so far as possible, the . . . [administrator's] purpose").  In other words, Respondents cannot make *Hernandez-Lara* inapposite (because it is about burdens of proof in bond hearings rather than entitlement to a bond hearing) simply by committing a *greater* procedural due-process violation here than was considered in that case.

The circumstances for detention under section 1225(b)(2) are essentially identical. As under section 1226(a), the Government has statutory discretion to release an individual detained under section 1225(b)(2), albeit based on slightly differently considerations.[14]  *See* 8 U.S.C. § 1182(d)(5)(A). That discretion (or any purported lack thereof) is likewise "cabin[ed]" by "the constitutional restraints applicable to ***all*** government action."[15]  *See Hernandez-Lara*, 10 F.4th at 34 (emphasis added). It follows that the process attending detention and release under section 1225(b)(2) may be assessed in the same manner.

It is further significant that the classes of individuals subject to detention under sections 1225(b)(2) and 1226(a) can be virtually identical, as illustrated by the facts of *Hernandez-Lara* and this very case. Both statutes "appl[y] to a wide swath of noncitizens, many of whom . . . have no criminal record at all." *See id.* at 36. "The exact length of detention under [either statute] is impossible to predict and can be quite lengthy." *See id.* at 29. For all practical purposes, Petitioner is in the same position as was the petitioner in *Hernandez-Lara*—detained pending the outcome of full removal proceedings to determine his admissibility. Dkt. 9-1 ¶¶ 9, 11; *cf. Hernandez-Lara*, 10 F.4th at 34 & n.7.

---

[14] It is thus admittedly somewhat of a misnomer to call detention under section 1225(b) "mandatory," *see Jennings*, 583 U.S. at 300 ("[T]here is a specific provision authorizing release from § 1225(b) detention."), albeit a useful one for distinguishing how the two detention statutes operate, *see id.* ("Here, by contrast, §§ 1225(b)(1) and (b)(2) do not use the word 'may.' Instead, they unequivocally mandate that aliens falling within their scope 'shall' be detained.").

[15] DHS, rather than the Attorney General, has discretion to grant parole under section 1182(d)(5)(A), as it did for Petitioner when he first arrived in the United States, based on "urgent humanitarian reasons or significant public benefit." Dkt. 9-1 ¶ 8; 8 U.S.C. § 1182(d)(5)(A). Strict parallelism between this case and *Hernandez-Lara* might suggest that the proper remedy would then be to require that DHS's parole discretion be exercised subject to the same "constitutional restraints applicable to all government action," rather than grant Petitioner access to process established pursuant to the Attorney General's authority under section 1226. *See Hernandez-Lara*, 10 F.4th at 34. However, for obvious reasons, the Court is disinclined to order that DHS invent its own bond procedures out of whole cloth where its sister agency's familiar and fitting process stands readily available nearby. *See Milliken v. Bradley*, 433 U.S. 267, 281 (1977) ("[T]he scope of a district court's equitable powers to remedy past wrongs is broad." (quoting *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971))).

Indeed, it is telling that, if the *Hernandez-Lara* petitioner were arrested today, Respondents would almost certainly argue that she is detained under section 1225(b)(2), rather than under section 1226(a). The *Hernandez-Lara* petitioner "entered the United States in 2013 without being admitted or paroled." *Hernandez-Lara*, 10 F.4th at 23. When she was arrested in 2018, DHS did so "pursuant to 8 U.S.C. § 1226(a)." *Id.* at 24. However, just recently, in July 2025, DHS "revisited its legal position on detention and release authorities" and "determined that [section 1225] . . . , rather than [section 1226], is the applicable immigration detention authority for all applicants for admission," meaning all non-citizens who, like the *Hernandez-Lara* petitioner, were "present in the United States [without having] been admitted," 8 U.S.C. § 1225(a)(1). *See Diaz Martinez v. Hyde*, 792 F. Supp. 3d 211, 217–18 & n.10 (D. Mass. 2025) (quoting an internal ICE memorandum issued by Acting Director Todd M. Lyons). Granted, district courts across the country have rejected this interpretation.[16] Nonetheless, it demonstrates the decidedly thin line determining who might fall in one class versus another.

Most importantly, neither class can reasonably be analogized to those unique cases where Congress has "made specific findings as to the dangerousness of a class of noncitizens" and where "those findings were found to have justified the detention of noncitizens even in the absence of individualized determinations as to danger and flight risk."[17] *See Hernandez-Lara*, 10 F.4th at 35–39 (distinguishing categorical detention for convicted criminals under section 1226(c), for

---

[16] *See* Kyle Cheney, *More Than 100 Judges Have Ruled Against the Trump Admin's Mandatory Detention Policy*, Politico (Oct. 31, 2025, 4:29 PM), https://www.politico.com/news/2025/10/31/trump-administration-mandatory-detention-deportation-00632086 [https://perma.cc/4NXW-GDM8].

[17] "As the Supreme Court has observed, a noncitizen's 'removable status itself . . . bears no relation to a detainee's dangerousness.'" *Hernandez-Lara*, 10 F.4th at 31 (quoting *Zadvydas*, 533 U.S. at 691–92). To the extent one finds any support for section 1225(b)'s detention mandate in arriving aliens' perceived flight risk, *see e.g.*, H.R. Rep. No. 104-469, pt. 1, at 117 (1996) (stating generally that a "majority" of non-citizens caught being "smuggled" into the country fail to appear for their immigration hearings), such facts are hard to make applicable to someone like Petitioner who was arrested *while appearing* for a scheduled ICE check-in, Dkt. 9-1 ¶ 13, which he had apparently been doing "for years," Dkt. 9 at 14.

Communists during the Cold War, and for those subject to final orders of removal under 8 U.S.C. § 1231 ("section 1231")).  For this reason, as in *Hernandez-Lara*, the Court need not reach the question of whether Petitioner's detention has become unreasonably "prolonged" before considering whether an absence of process problematizes that detention in the first instance.[18]  *See id.* at 25 n.2.

Finally, the Court notes that it does not write here upon a blank slate.  Notably, in *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024), the Second Circuit, citing the First Circuit's decision in *Hernandez-Lara*, concluded that procedural due-process challenges to detention under

---

[18] As the Court has recognized, other courts to consider as-applied, constitutional challenges to detention under section 1225(b) have often focused on the question of whether detention has become unreasonably "prolonged." *See Velasquez Rincon*, 2025 WL 3122784, at *8 n.23 (noting that such courts have generally done so under very different circumstances, citing, *e.g.*, *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1117 (W.D. Wash. 2019)).  As the First Circuit has recognized, however, prolonged detention is a distinct (and not necessarily first-order) basis for a due-process claim.  *See Hernandez-Lara*, 10 F.4th at 25 n.2.  Thus, it is sufficient to say that those courts were simply considering a different kind of claim and thus reasonably did so with a different kind of analysis.  To the extent one might argue that the *only* claim an individual detained under section 1225(b) may bring is that their detention has become unreasonably prolonged, that logical jump requires analogizing the circumstances of detention under section 1225(b) to one of the other categorical bases whereby Congress's "specific findings . . . were found to have justified the detention of noncitizens even in the absence of individualized determinations."  *See id.* at 36.  For the reasons stated in this section, the Court finds that analogy untenable.

Furthermore, the Court notes the logical mismatch in finding detention pending removal proceedings unconstitutional only when it is "prolonged."  Where removal is neither imminent nor inevitable—which would likely be the case on 'day one' of detention as much as it is months later—"the ultimate purpose behind the detention" becomes abstract and thus the detention itself suspect.  *See Demore v. Kim*, 538 U.S. 510, 531 (2003) (Kennedy, J., concurring).  This logic is apparent in the context of convicted-criminal detention under section 1226(c), where the length of an individual's detention may certainly demonstrate that removal will not be as quick and easy as the Supreme Court assumed in *Demore* but where lengthy detention is not necessarily a prerequisite to make that showing.  *See Reid v. Donelan*, 17 F.4th 1, 8 (1st Cir. 2021) (declining to adopt a "bright-line" rule that all individuals detained under section 1226(c) must be given a bond hearing after six months but stating that, on a case-by-case basis, hearings might be required after "even less time").  The exception further proves the rule when one considers detention pursuant to a final order of removal under section 1231.  *See Zadvydas*, 533 U.S. at 700–01 (adopting a six-month "presumption" of reasonableness).  In that context, the fact that the Government has not managed to remove an individual within six months provides for the inference that it never will, at least not in the foreseeable future.  In both cases, it is not the prolongedness of the detention, *per se*, that makes the violation but rather what that duration shows about the ongoing detention's lawful purpose (or lack thereof).

section 1226(c) should be analyzed under *Mathews*.[19]  *Id.* at 147–48 (likewise citing decisions from the Third, Fourth, and Ninth Circuits).  Following that decision, district courts in the Second Circuit have concluded that procedural due-process claims concerning detention under section 1225(b) should likewise be analyzed under *Mathews*.  *See, e.g.*, *Al-Thuraya v. Warden, Orange Cnty. Corr. Facility*, 2025 WL 2858422, at 2–3 (S.D.N.Y. Oct. 9, 2025) (ordering that a petitioner be given a bond hearing); *Rashid v. Trump*, — F. Supp. —, 2025 WL 3210955, at *10 (D. Vt. Oct. 27, 2025) (same); *see also, e.g.*, *Rodrigues De Oliveira v. Joyce*, 2025 WL 1826118, at *6 (D. Me. July 2, 2025) (same).  Given the significant analytic overlap between these cases, Petitioner's, *Black*, and *Hernandez-Lara*, the Court sees no reason to invent or adopt a new procedural due-process test just for this occasion.

### b.    *Mathews* Factors

Consideration of the *Mathews* factors clearly demonstrates that Petitioner has not received sufficient process to justify his ongoing deprivation of liberty.

> The *Mathews* factors are: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Hernandez-Lara*, 10 F.4th at 28 (quoting *Mathews*, 424 U.S. at 335).

---

[19] As the Second Circuit noted, its holding as to section 1226(c) is not inconsistent with *Reid*, wherein the First Circuit "acknowledged 'that the Due Process Clause imposes some form of "reasonableness" limitation upon the duration of detention under section 1226(c),' but did not address when and under what circumstances additional procedural protections are due."  *See Black*, 103 F.4th at 146 n.17 (internal citation omitted) (quoting *Reid*, 17 F.4th at 7 (internal quotation marks and alterations omitted)).  In an earlier, now-withdrawn *Reid* opinion, the First Circuit did identify a non-exhaustive list of "guideposts" (not drawn from *Mathews*) to assess the reasonableness of detention under section 1226(c).  *See Reid v. Donelan*, 819 F.3d 486, 500–01 (1st Cir. 2016), *opinion withdrawn on reconsideration*, 2018 WL 4000993 (1st Cir. May 11, 2018).  However, those were put forth for purposes of an implicit reasonableness requirement that the court (at that time) found in the statute, rather than as a means of assessing a constitutional claim.  *See Reid*, 17 F.4th at 5 (discussing the prior *Reid* opinion).  Thus, *Black* is not inconsistent even with that initial, now-withdrawn *Reid* opinion.

### i.     __Private Interest__

The first factor weighs heavily in favor of relief.  "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."  *Zadvydas*, 533 U.S. at 690.  "The Supreme Court has repeatedly affirmed that '[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.'"  *Hernandez-Lara*, 10 F.4th at 27 (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)).  "For this reason, 'civil commitment <u>for any purpose</u> constitutes a significant deprivation of liberty that requires due process protections.'"  *Id.* (emphasis in original) (quoting *Addington v. Texas*, 441 U.S. 418, 425 (emphasis added)).

Like the First Circuit, this Court "recognize[s] that removal proceedings have an end point and that the liberty interest of a noncitizen detained under section [1225(b)(2)] may therefore be slightly less weighty than that of individuals facing indefinite and prolonged detention."  *See id.* at 29.  But, also like the First Circuit, this Court finds that interest "only slightly less: The exact length of detention under section [1225(b)(2)] is impossible to predict and can be quite lengthy, as [Petitioner's] case illustrates well."[20]  *See id.*  In the meantime, Petitioner sits in prison, away from his wife and daughter.  Dkt. 9-1 ¶ 13; Dkt. 1 ¶ 27.

---

[20] Notwithstanding the *Hernandez-Lara* court's distinction, the Court notes that, in common parlance, many would just call that "indefinite," since it lacks a definite, imminent, or predictable end.  *See Indefinite*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/indefinite (last visited Nov. 25, 2025) ("not definite: such as . . . a: not precise: vague[;] b: having no exact limits[;] c: typically designating an unidentified, generic, or unfamiliar person or thing").  It is certainly not "definite" in the sense that the Supreme Court used that word in *Demore*.  *See* 538 U.S. at 529 (referring to detention that, "in the majority of cases," lasts for less than 90 days); *see also Asylum in the United States*, AM. IMMIGR. COUNCIL (May 9, 2025), https://www.americanimmigrationcouncil.org/fact-sheet/asylum-united-states/     [https://perma.cc/HZ2P-FMN8] ("Individuals with an immigration court case who were ultimately granted relief such as asylum in FY 2024 waited more than 1,283 days on average for that outcome."); *Immigration Court Quick Facts*, TRANSACTIONAL RECS. ACCESS CLEARINGHOUSE, https://tracreports.org/immigration/quickfacts/eoir.html (last visited Nov. 25, 2025) [https://perma.cc/555T-3R7X] (showing that, as of August 2025, there were 3,432,519 active cases pending in the immigration courts).

That disruption of established family ties further compounds Petitioner's deprivation of liberty. While Congress possesses broad power over immigration, often "mak[ing] rules that would be unacceptable if applied to citizens," that power is not absolute. *See Demore v. Kim*, 538 U.S. 510, 521 (2003) (quoting *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976)). "No one can claim, nor since the time of slavery has anyone to my knowledge successfully claimed, that persons held within the United States are totally without constitutional protection." *Jennings*, 583 U.S. at 332 (Breyer, J., dissenting).[21]

We could all stand to pause for a moment and consider what it would mean, personally, to be separated from our families. Now, discount that loss by however much you think Petitioner's immigration status makes it actually not that big of a deal. The Court submits that there is no humane way to perform that calculus without concluding that Petitioner has a tremendous interest at stake here.

### ii.    <u>Risk of Erroneous Deprivation</u>

Likewise, the risk of erroneous deprivation is high. "In the absence of relief, the only mechanism Petitioner has to test the propriety of his detention is DHS's discretionary authority to grant parole. Of course, that is no real test at all." *See Velasquez Rincon*, 2025 WL 3122784, at *9 (D. Mass. Nov. 7, 2025) (internal citation omitted) (citing 8 U.S.C. § 1182(d)(5)(A)); *see also Hernandez-Lara*, 10 F.4th at 30 (finding that the risk "weigh[ed] heavily" in favor of relief where the petitioner had access to a bond hearing but was disadvantaged at that hearing).

---

[21] Although written in dissent, Justice Breyer's constitutional analysis in *Jennings* was not directly contradicted by the majority, which declined to reach those issues. *See Jennings*, 583 U.S. at 297–98, 306–12 (holding that the constitutional-avoidance canon cannot be used to "rewrite a statute," notwithstanding any "constitutional issue[s]" with that statute); *id.* at 312 (remanding for further consideration of the constitutional arguments).

### iii. __Government Interest__

The third *Mathews* factor considers "'the Government's interest' . . . which ultimately entails an assessment of the 'public interest.'" *Hernandez-Lara*, 10 F.4th at 32 (quoting *Mathews*, 424 U.S. at 335). Most straightforwardly, the Court recognizes that bond hearings entail an "administrative burden[]." *See Mathews*, 424 U.S. at 335. That being said, "[c]ourts generally have found that the cost of providing a bond hearing is relatively minimal." *Hilario M.R. v. Warden, Mesa Verde Det. Ctr.*, 2025 WL 1158841, at *9 (E.D. Cal. Apr. 21, 2025) (citing cases).

More complicatedly, "[t]he prompt execution of removal orders is a legitimate governmental interest, which detention may facilitate." *See Hernandez-Lara*, 10 F.4th at 32 (internal citation omitted). In other words, the Government has an interest in detention insofar as it makes more likely that it will be able to execute a removal order later, if one is ordered. That interest, of course, is frustrated when an individual flees. But, put simply, the Court is unaware of any evidence that the immigration courts have proven incapable of preventing that result. As such, "[t]he government fails to explain why its proffered interest in securing appearance at removal proceedings and for deportation holds sway where a noncitizen is not a flight risk." *See id.* Of course, any process with an eye toward safeguarding liberty will admit of some tolerated residuum—the Court does not doubt that there may be cases where an individual has slipped through the cracks—but if that argument were sufficient, then there would be no justification for bail or due process at all.

On the other side of the ledger, there are "substantial societal costs," borne by the public:

> [N]oncitizens subject to immigration detention include spouses, children, and parents of U.S. citizens, caretakers of children and elderly relatives, and leaders in religious, cultural, and social groups. The needless detention of those individuals thus "separates families and removes from the community breadwinners, caregivers, parents, siblings and employees." Those ruptures in the fabric of communal life impact society in intangible ways that are difficult to calculate in dollars and cents. Even so, as twenty states report in an amicus brief to this court, the financial costs imposed by such widespread communal disruption are severe: "[States'] revenues drop because of reduced economic contributions and tax payments by detained immigrants, and their expenses rise because of increased social welfare payments in response to the harms caused by unnecessary detention."

*Id.* (internal citation omitted) (second brackets in original) (first quoting *Velasco Lopez v. Decker*, 978 F.3d 842, 855 (2d Cir. 2020)). Indeed, given that a lack of procedure justifying Petitioner's detention may lead to an "instance[] of needless detention, entailing substantial social and financial costs," the public interest in denying him a bond hearing "is uncertain at best, and may well be negative." *Id.*; *see also Velasco Lopez*, 978 F.3d at 857 ("The irony in this case is that, in the end, all interested parties prevailed. The Government has prevailed because it has no interest in the continued incarceration of an individual who it cannot show to be either a flight risk or a danger to his community. [The petitioner] has prevailed because he is no longer incarcerated. And the public's interest in seeing that individuals who need not be jailed are not incarcerated has been vindicated."). Thus, even assuming that the final *Mathews* factor still weighs overall against relief, it does so with great unsurety and ambivalence and, as such, is substantially outweighed by Petitioner's liberty interest and the risk of its erroneous deprivation.

In sum, the Court finds that the *Mathews* factors weigh definitely in favor of relief, that Petitioner's detention without a bond hearing violates his due-process rights, and that a bond hearing is an appropriate and minimally invasive additional procedure to ensure that right.

## III.  <u>Conclusion</u>

For the foregoing reasons, this Petition is GRANTED in part. The Court ORDERS that Petitioner receive a constitutionally adequate bond hearing to consider the merits of his release.

**So Ordered.**

/s/ Brian E. Murphy
_____

Brian E. Murphy

Dated:  November 25, 2025            Judge, United States District Court